UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| KHAFRA K. OMRAZETI, | § | |
| | § | |
| Plaintiff, | § | Cv. No. SA:12-CV-00730-DAE |
| | § | |
| vs. | § | |
| | § | |
| AURORA BANK FSB, | § | |
| AURORA LOAN SERVICES, | § | |
| NATIONSTAR MORTGAGE LLC, | § | |
| AND DEUTSCHE BANK NATIONAL | § | |
| TRUST COMPANY | § | |
| | § | |
| Defendants. | § | |

<u>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS</u>

On June 5, 2013, the Court heard oral argument on the Motion to Dismiss Second Amended Complaint filed by Defendants Aurora Bank FSB, individually and as subservicer to Aurora Loan Services LLC ("Aurora"); Nationstar Mortgage LLC ("Nationstar"); and Deutsche Bank National Trust Company ("Deutsche Bank") (collectively, "Defendants"). (Doc. # 19.) Justin Opitz, Esq., appeared on behalf of Defendants. Lynda Ladymon, Esq., appeared on behalf of Plaintiff Khafra K. Omrazeti. After carefully considering the Motion, and in light of the parties' arguments at the hearing, the Court, for the reasons that follow, **GRANTS** Defendants' Motion to Dismiss.

## BACKGROUND

In 2007, Plaintiff Khafra Omrazeti purchased two tracts of real property in Bexar County, Texas.  (Doc. # 17 ("SAC") ¶ 4.)  The first is located at 24610 Alamoso Falls, San Antonio, TX 78255; the second is located at 25710 Gold Yarrow, San Antonio, TX 78260.  (Id. ¶¶ 4–5.)  First Magnus Financial Corporation ("First Magnus") was the original lender on both mortgages.  (Id.)  According to the SAC, however, Defendant Aurora later claimed to be the assignee of the Deeds of Trust.  (Id. ¶ 4.)

At some point (Plaintiff does not provide a date), Aurora initiated foreclosure proceedings on the two properties, and on July 2, 2012, Plaintiff brought suit against Aurora in the 438th Judicial District Court of Bexar County, Texas, seeking to enjoin the foreclosures.  (Doc. # 1-1.)  The state-court Petition contended that Aurora lacked standing to foreclose as a result of allegedly invalid assignments and asserted causes of action for fraud, misrepresentation, negligence, wrongful foreclosure, and to quiet title.  (Id. ¶ 10–11, 13–19.)

On July 27, 2012, Aurora removed the case to this Court on the basis of diversity jurisdiction.  (Doc. # 1 at 3–5.)  On September 25, 2012, Aurora filed a Motion to Dismiss Plaintiff's Original Petition for failure to state a claim. (Doc. # 5.)  On December 3, 2012, Plaintiff filed an Amended Complaint. (Doc. # 8.)  On December 17, 2012, Aurora moved to dismiss the Amended

Complaint.  (Doc. # 9.)  On April 5, 2013, Plaintiff filed his Second Amended Complaint, adding Nationstar (which by that time purported to be the assignee of the deed of trust and the mortgage servicer, <u>see</u> SAC ¶¶ 4, 5) and Deutsche Bank (the purported holder of the Notes, <u>see</u> <u>id.</u> ¶¶ 6, 9) as Defendants.  (Doc. # 17.)

On April 19, 2013, Defendants filed a Motion to Dismiss Plaintiff's Second Amended Original Complaint.  (Doc. # 19.)  Plaintiff did not file a Response.  Defendants' Motion to Dismiss is now before the Court.

<u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Review is limited to the contents of the complaint and matters properly subject to judicial notice.  <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007).  In analyzing a motion to dismiss for failure to state a claim, "[t]he court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  <u>In re Katrina Canal Breaches Litig.</u>, 495 F.3d 191, 205 (5th Cir. 2007) (quoting <u>Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit</u>, 369 F.3d 464, 467 (5th Cir. 2004)).  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A complaint need not include detailed facts to survive a Rule 12(b)(6) motion to dismiss.  See Twombly, 550 U.S. at 555–56.  In providing grounds for relief, however, a plaintiff must do more than recite the formulaic elements of a cause of action.  See id. at 556–57.  "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  Iqbal, 556 U.S. at 678 (internal quotations and citations omitted).  Thus, although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations."  Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); see also Plotkin v. IP Axess Inc., 407 F.3d 690, 696 (5th Cir. 2005) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

When a complaint fails to adequately state a claim, such deficiency should be "exposed at the point of minimum expenditure of time and money by the parties and the court."  Twombly, 550 U.S. at 558 (citation omitted).  However, the plaintiff should generally be given at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice.  Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002).

4

<u>DISCUSSION</u>

I.    <u>Plaintiff's Standing to Challenge the Assignment of the Deeds of Trust and
      Notes</u>

         Because Plaintiff's claims are all based on his argument that

Defendants obtained the Deeds of Trust and the Notes through invalid

assignments, the Court begins by addressing whether Plaintiff has standing to

challenge those assignments.

      A.   <u>The Challenged Assignments</u>

         The original lender on Plaintiff's two mortgages was First Magnus.

(<u>See</u> SAC ¶ 5; doc. # 5 Exs. A, B (certified copies of the Deeds of Trust).)  The

Deeds of Trust named Mortgage Electronic Registration Systems ("MERS") as the

beneficiary and nominee for First Magnus and granted MERS the power to

foreclose and sell the property.  (Doc. # 5 Exs. A at 3–4; <u>id.</u> Ex. B at 3–4.)

         Now, however, Deutsche Bank claims to hold, "as trustee of a

securitized trust," the Notes corresponding to Plaintiff's mortgages.  (SAC ¶ 6.)

Aurora, says Plaintiff, once claimed to be the assignee of the Deeds of Trust and

the servicer of his mortgages.  (<u>Id.</u> ¶ 4.)  (That Aurora was at least <u>acting</u> as

mortgage servicer is clear from Plaintiff's own allegations: Plaintiff states that he

"did obtain a modification at one point from Aurora Mortgage . . . ." (<u>Id.</u> ¶ 6.))  At

some point, however—apparently after it initiated foreclosure proceedings—

Aurora "purported to transfer whatever rights it held in the Plaintiff's mortgages to Nationstar . . . ." (Id. ¶ 6; id. at 2 n.1.)[1] Accordingly, Plaintiff appears to allege that, at present, Deutsche Bank purports to hold the Notes and Nationstar purports to be the assignee of the Deeds of Trust.

Plaintiff concedes that, on their face, "the real property records establish[] a chain of title in Defendants . . . ." (SAC ¶ 18.) However, he insists that "none of the Defendants have the authority to foreclose on the real property and could not have properly obtained a valid assignment of the lien." (Id. ¶ 5.) The real property records are incorrect, insists Plaintiff, because "Defendants have stepped in and filed assignments of Deeds of Trust based upon invalid and/or fraudulent documents . . . ." (id. ¶ 23).

In support of this assertion, Plaintiff appears to argue that any assignment from First Magnus to another party must have been fraudulent since First Magnus "filed [for] bankruptcy on August 21, 2007," and since the bankruptcy court entered an order prohibiting First Magnus from transferring any assets. (Id. ¶ 5.) While Plaintiff's mortgages were "purportedly securitized into a trust and sold on Wall Street," they were "never validly transferred into those trusts" due to the bankruptcy court's order forbidding transfers. (Id.) "Defendants

---

[1] At the hearing, the parties seemed to agree that Aurora had assigned the mortgage to Nationstar after Aurora filed for bankruptcy. However, the parties provided no information about Aurora's bankruptcy or the circumstances of the assignment in their papers.

cannot establish," insists Plaintiff, "that MERS (acting through an Aurora employee) had the right to contravene a Federal Bankruptcy Court Order and assign the loans."  (<u>Id.</u> ¶ 8.)  Plaintiff also appears to argue that any assignment of his loan to a trust is invalid because it took place after the closing date of the trust. (<u>Id.</u> at 5.)  Plaintiff did not provide a copy of or citation to the bankruptcy court's order, state when the closing date of the trust was, or state when his mortgages were purportedly transferred to the trust.

     B.  <u>Plaintiff Does Not Have Standing to Challenge These Assignments</u>

        Because Plaintiff has conceded that the real property records do establish a chain of title in Defendants (SAC ¶ 18), the first question is whether Plaintiff has standing to challenge the assignments that resulted in Deutsche Bank holding the Notes and Nationstar being the assignee of the Deeds of Trust— assignments to which he was not a party.  For the reasons that follow, the Court concludes that Plaintiff does not have standing.

        As this Court has explained, whether a plaintiff-mortgagor has standing to challenge the validity of an assignment to which he was not a party depends on the nature of the challenge asserted.  <u>See</u> <u>Howard v. J.P. Morgan Chase N.A.</u>, Cv. No. SA-12-CV-00440-DAE, 2013 WL 1694659, at *5 (W.D. Tex. Apr. 18, 2013); <u>Calderon v. Bank of America N.A.</u>, Cv. No. SA:12-CV-00121-DAE, 2013 WL 1741951, at *9 (W.D. Tex. April 23, 2013).  Specifically, a

plaintiff-mortgagor has standing to assert against an assignee any challenge that

would render the assignment void rather than merely voidable.  Tri-Cities Constr.,

Inc. v. Am. Nat'l Ins. Co., 523 S.W.2d 426, 430 (Tex. Civ. App. 1975).  As the

Texas Court of Appeals has put it:

> The law is settled that the obligors of a claim may defend the suit brought
> thereon on any ground which renders the assignment void, but may not
> defend on any ground which renders the assignment voidable only, because
> the only interest or right which an obligor of a claim has in the instrument of
> assignment is to insure himself that he will not have to pay the same claim
> twice.

Tri–Cities, 523 S.W.2d at 430 (citing Glass v. Carpenter, 330 S.W.2d 530, 537

(Tex. Civ. App. 1959)).  This rule accords with long-established principles of

contract law.  A void contract is "invalid or unlawful from its inception" and

therefore cannot be enforced.  17A C.J.S. Contracts § 169.  Thus, a mortgagor who

was not a party to an assignment between mortgagees may nevertheless challenge

the enforcement of an assignment if the assignment is void.  A voidable contract,

on the other hand, "is one where one or more of the parties have the power, by the

manifestation of an election to do so, to avoid the legal relations created by the

contract."  Id.  Accordingly, only the parties to a voidable contract may seek to

avoid its enforcement.

Plaintiff alleges (1) that MERS violated a bankruptcy court order

when it transferred the Deeds of Trust to Aurora and (2) that the Notes were not

validly transferred to a trust because they were transferred after the trust's closing

date.  For the reasons that follow, Plaintiff challenges the assignment of the Notes and Deeds of Trust on grounds that would render them <u>voidable</u>, not void; and he does not, therefore, have standing to bring those challenges.

   1. <u>An Unauthorized Post-Petition Transfer is Voidable by the Bankruptcy Trustee</u>

   Plaintiff asserts that "First Magnus Financial filed chapter 11 bankruptcy only a few months after obtaining the lien on Plaintiffs' [sic] property" and that "an order was entered by the trustee prohibiting assignments or transfers." (SAC ¶ 5.)  Later in the same paragraph, Plaintiff states that "there was a prohibition entered by the Court from transferring any assets."  (<u>Id.</u>)  Under another subheading, Plaintiff states that "Defendants cannot establish that MERS (acting through an Aurora employee) had the right to contravene a Federal Bankruptcy Court Order and assign the loans."  (<u>Id.</u> ¶ 8.)  Plaintiff did not provide a copy of or citation to the bankruptcy court's order, state when that order was entered, or state when First Magnus transferred its interest to Aurora.  Indeed, it is unclear whether Plaintiff is referring to an order of the bankruptcy court or to some other decision made by the bankruptcy trustee, since Plaintiff first states that "an order was entered <u>by the trustee</u>" and then mentions a "prohibition entered <u>by the Court</u> . . . ."  (<u>Id.</u> ¶ 5 (emphases added).)  Accordingly, at the hearing, the Court requested a citation to the relevant bankruptcy court order.  Plaintiff's counsel

provided a case citation: <u>In re First Magnus Fin. Corp.</u>, 4:07-bk-01578-EWH

(Bankr. D. Ariz. 2007).  However, Plaintiff did not cite to a specific document on

the docket, and there are currently more than 7,350 entries.  Despite the Court's

best effort to look at all orders on the docket, the Court has been unable to find the

order to which Plaintiff's counsel referred.

   Absent evidence to the contrary, the Court will assume that Plaintiff is

arguing that Aurora obtained First Magnus's interest in his mortgage in violation

of the automatic stay.  Under 11 U.S.C. § 362(a)(4), the filing of a bankruptcy

petition automatically triggers a stay against "any act to . . . enforce any lien

against property of the estate."  "The stay provides the bankrupt a period of respite

so that he will have an opportunity to make appropriate plans for reorganization

and remains in effect until the bankruptcy proceeding is concluded or the property

at issue is no longer in the bankruptcy estate."  <u>Paine v. Sealy</u>, 956 S.W.2d 803,

805 (Tex. App. 1997) (citing 11 U.S.C. § 362(a)(1), (c)).

   While some courts disagree, <u>see, e.g.</u>, <u>Helfrich v. Thompson (In re</u>

<u>Thompson )</u>, 273 B.R. 143, 144 (Bankr. S.D. Ohio 2001), the Fifth Circuit has

consistently held that actions taken in violation of the automatic stay are <u>voidable</u>

<u>rather than void</u>.  As the Fifth Circuit explained in <u>In re Coho Resources, Inc.</u>,

> Courts disagree . . . as to the effect of violations of [the] automatic stay.
> Some courts hold that acts in violation of the stay are void <u>ab initio</u> and
> incurable.  [Footnote omitted.]  We adhere to the view that violations are
> merely "voidable" and are subject to discretionary "cure."  [Footnote

omitted.]  This position rests on the bankruptcy court's statutory power to annul the automatic stay [footnote omitted], i.e., to "lift the automatic stay retroactively and thereby validate actions which otherwise would be void."

345 F.3d 338, 344 (5th Cir. 2003) (quoting Sikes v. Global Mar., Inc., 881 F.2d

176, 178 (5th Cir.1989); see also Sikes, 881 F.2d at 178 (explaining that the

"characterization of every violation of section 362 as being absolutely void is

inaccurate and overly broad") (internal quotations marks omitted); re All Trac

Transp., 306 B.R. 859, 874 (Bankr. N.D. Tex. 2004) ("In the Fifth Circuit, a

violation of the automatic stay is voidable, not void.").  Because the bankruptcy

court may cure any violations of the automatic stay, such transactions are voidable,

not void, and Plaintiff, who was not a party to the transactions, has no standing to

challenge them.

Assuming, in the alternative, that Plaintiff is arguing that First

Magnus somehow transferred its interest to Aurora without the Trustee's

authorization, he also lacks standing to bring that challenge.  Section 549 of the

Bankruptcy Code (the "Code") provides that "the trustee may avoid a transfer of

property of the estate (1) that occurs after the commencement of the case; and

(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or (B) that

is not authorized under this title or by the court."  11 U.S.C. § 549(a)(1)(B)

(emphasis added).  As the Bankruptcy Court for the Northern District of Texas has

explained:

> In order to establish a claim under § 549, the Trustee need only establish that (1) a transfer occurred, (2) the transfer occurred after the commencement of the case, (3) the transfer was made without court authority, and (4) the property transferred was property of the estate. See In re Advanced Modular Power Sys., Inc., 413 B.R. 643 (Bankr. S.D. Tex. 2009). The Trustee need not establish that the transfer was by the debtor, or that the transfer was voluntary.

In re Vallecito Gas, LLC, 440 B.R. 457, 481 n.21; see also C.J.S. Bankruptcy

§ 668 ("Generally, the trustee or other person exercising the avoidance power may

avoid a transfer of property of the estate that occurs after the commencement of the

bankruptcy case, provided that such transfer is not authorized by the Bankruptcy

Code or by the court.").  Section 549 makes clear that transfers that take place after

the commencement of a bankruptcy case, even if unauthorized, are not void ab

initio; instead, they may be voided at the option of the bankruptcy trustee.  See In

re Schwartz, 954 F.2d 569, 573 (9th Cir. 1992) ("[S]ection 549 implies that some

of these [unauthorized] transactions will be valid unless affirmatively challenged

by the trustee.") (emphasis added); see also In re Paxton, 440 F.3d 233, 237 (5th

Cir. 2006) (vacating the district court's judgment "to the extent that it set aside [a

post-petition sale] based [solely] on violation of the automatic stay" and noting that

the key question in the case was "[w]hether § 549 gave the Trustee the right to set

aside the [post-petition] tax sale"); In re Advanced Modular Power Sys., Inc., 413

B.R. 643, 672–73 (Bankr. S.D. Tex. 2009) (holding that trustee could, pursuant to

§ 549, avoid unauthorized post-petition transfers of estate property).

Accordingly, even assuming the truth of Plaintiff's allegations—even assuming that First Magnus's interest in Plaintiff's loan was transferred to Defendants after First Magnus filed for bankruptcy—that transaction would merely be voidable at the option of the bankruptcy court or at the option of First Magnus's Chapter 11 Trustee.[2]   Because Plaintiff's allegations, if true, would not render the assignment void, Plaintiff does not have standing to challenge the assignment, to which she was not a party, on the ground that it violated an order of the bankruptcy court.

>    2.   <u>A Transfer Occurring After the Closing Date of a Trust Is</u>
>
>         <u>Voidable by the Trustee</u>

Construing the Complaint liberally in Plaintiff's favor, he also appears to challenge the transfer of the Notes to a "Wall Street" trust on the ground that "[d]ocuments on file with the SEC establish that all assignments had to take place by the close date of the trust . . . ."  (SAC ¶ 5.)  Plaintiff does not state the date on which the relevant trust supposedly closed or the date on which the Notes were

---

[2] At the hearing, Plaintiff's counsel provided the Court with the docket number of a bankruptcy case from the Northern District of Texas (<u>In re Abusaad,</u> 03-bk-81289-hdh13 (Bankr. N.D. Tex. 2003)), insisting that the case supported her contention (made for the first time at the hearing) that a post-petition transfer would be void, not voidable.  However, the Court has been unable to find the order to which Plaintiff's counsel referred, both because she did not cite to a specific document on the docket and because that case's documents are not available through the electronic court filing system or Westlaw.  In the future, Plaintiff's counsel would be wise to address relevant case law in a Response to any motion to dismiss.

purportedly transferred to the trust.  Plaintiff does, however, acknowledge that

Deutsche Bank purports to hold the Notes as trustee for this unnamed trust.

(SAC ¶¶ 6, 9.)  Once again, whether Plaintiff has standing to challenge the transfer

of the Notes to the trust depends on whether his allegations, if true, would render

that assignment void or merely voidable.

   Plaintiff provides no information about the trust except to refer to it as

one that was "sold on Wall Street."  (SAC ¶ 5.)  In the absence of evidence

suggesting otherwise, then, the Court will assume that this trust is governed by

New York law.  Even assuming that the transaction that Plaintiff challenges

violated the terms of the trust, however, that after-the-deadline transaction would

merely be <u>voidable</u> at the election of one or more of the parties—not void.

   As this Court explained in <u>Calderon</u>, New York courts have made

clear that a beneficiary can ratify a trustee's ultra vires act.  <u>See</u> 2013 WL

1741951, at *11–*12 (collecting cases); <u>see also</u> 106 N.Y. Jur. 2d Trusts § 431

(2013) ("[T]rustee may bind trust to an otherwise invalid act or agreement which is

outside the scope of the trustee's power when beneficiary consents to or ratifies the

trustee's ultra vires act or agreement.").  If an act may be ratified, <u>it is voidable</u>

<u>rather than void</u>.  <u>See</u> <u>Hacket v. Hackett</u>, 950 N.Y.S.2d 608, 2012 WL 669525, at

*20 (N.Y. Sup. Ct. Feb. 21, 2012) ("A void contract cannot be ratified; it binds no

one and is a nullity. However, an agreement that is merely voidable by one party

leaves both parties at liberty to ratify the transaction and insist upon its performance.") (quoting 27 Williston on Contracts § 70:13 [4th ed.]) (internal quotation marks omitted); 17 C.J.S. Contracts § 4 (noting that "a <u>void</u> contract . . . is no contract whatsoever" and "cannot be validated by ratification" but "[a] contract that is merely voidable is capable of being confirmed or ratified by the party having the right to avoid it . . . .").

Because a trustee's unauthorized transactions may be ratified, such transactions are <u>voidable</u>—not void.  Thus, even if it is true that the Notes were transferred to the trust in violation of the trust's terms, that transaction could be ratified by the beneficiaries of the trust and is therefore merely voidable.  Plaintiff does not allege that he is a beneficiary of or in some other way a party to the "Wall Street" trust.  Moreover, for the reasons given, Plaintiff does not have standing to challenge an assignment to which he was not a party unless that assignment was void.  Accordingly, since even an after-the-deadline transfer of the Notes to the trust would merely be voidable at the option of the trust's beneficiaries, Plaintiff has no standing to challenge that assignment.

II.    <u>"Misrepresentation/Fraud/Negligence"</u>

Having established that Plaintiff, at least on the facts alleged, does not have standing to challenge the assignment of Notes or Deeds of Trust, the Court turns to the causes of action that he alleges.  Plaintiff's first cause of action is

entitled "Misrepresentation/Fraud/Negligence."  Construing the SAC liberally in

Plaintiff's favor, the Court understands him to be alleging three distinct causes of

action under this subheading: (1) negligent misrepresentation; (2) fraud by

misrepresentation; and (3) negligence.  Nevertheless, Plaintiff fails to state a claim.

   A.  Negligent Misrepresentation

         Under Texas law, a claim for negligent misrepresentation consists of

four elements:

> (1) the representation is made by a defendant in the course of his business, or
> in a transaction in which he has a pecuniary interest; (2) the defendant
> supplies "false information" for the guidance of others in their business; (3)
> the defendant did not exercise reasonable care or competence in obtaining or
> communicating the information; and (4) the plaintiff suffers pecuniary loss
> by justifiably relying on the representation.

Gen. Elec. Capital Corp. v. Posey, 415 F.3d 391, 395–96 (5th Cir. 2005) (quoting

Clardy Mfg. Co. v. Mar. Midland Bus. Loans, Inc., 88 F.3d 347, 357 (5th Cir.

1996)).

         Plaintiff appears to allege two misrepresentations.  First, Plaintiff

claims that Defendants misrepresented "that they were entitled to foreclose

pursuant to the powers in the Deed of Trust" even though they "did not have the

right to do so."  (SAC ¶ 15.)  Plaintiff insists that these representations were made

"[in] the notices of sale," which were "sent by Aurora Bank and Nationstar."  (Id.)

According to Plaintiff, Aurora sent a notice of sale in June 2012, and Nationstar

sent another in December 2012.  (Id.)  Allegedly, each notice "demanded an

16

amount that was incorrect and . . . [incorrectly] claimed [Defendants] had legal rights to foreclose."  (Id.)  Plaintiff claims that he "relied on these claims and obtained counsel to defend against [them]," forcing him to spend money to litigate this action and to post a bond.  (Id.)  Second, Plaintiff alleges that Aurora "stated that if he [made] payments on time for a [loan] modification that [the modification] would be permanent" but instead began foreclosure proceedings.

### 1.  Alleged Misrepresentations in the Notice of Sale

Plaintiff's first negligent misrepresentation claim—based on alleged misrepresentations in the notices of sale—fails.  First, Plaintiff's claim that it was a "misrepresentation" for Defendants to assert that they were entitled to foreclose appears to be based on nothing more than his argument that Defendants obtained the Notes and Deeds of Trust via fraudulent assignments; and, for the reasons given in Part I, supra, Plaintiff does not have standing to challenge those assignments.  Accordingly, Plaintiff pleads no facts to support the conclusion that Defendants made a misrepresentation.

Second, even assuming that the Defendants' representations that they were entitled to foreclose were false, Plaintiff has pleaded no facts to establish (1) that Defendants did not use reasonable care in making those representations or (2) that Plaintiff relied on those misrepresentations.  To begin, Plaintiff simply does not plead anything that could be construed as satisfying the element that

Defendants did not use reasonable care in making the representation, such as an allegation that they should have known that they did not have the right to foreclose. Furthermore, Plaintiff claims that he "relied on" Defendants' claim that they were entitled to foreclose when he "obtained counsel to defend against [them]" and that this forced him to spend money to litigate this action and to post a bond. (SAC ¶ 15.)  However, Plaintiff's own allegations belie his contention that he "relied on" Defendants' representations: Plaintiff obtained counsel to defend against foreclosure because he did not believe that Defendants had the right to foreclose on his property.  Plaintiff could not have "relied on" a misrepresentation that he never believed was true.  See Bennett v. JPMorgan Chase, 3:12-CV-212-N, 2013 WL 655059, at *6 (N.D. Tex. Feb. 5, 2013) ("Plaintiff's statement that he retained legal counsel to 'prevent' the foreclosure fails to show reasonable reliance on his part, and shows instead his attempt to contest Defendants' purportedly fraudulent actions.").  Accordingly, Plaintiff's first negligent misrepresentation claim is dismissed.

### 2.  Alleged Misrepresentation Concerning Loan Modification

Plaintiff's second negligent misrepresentation claim is based on the allegation that Aurora "stated that if he [made] payments on time for a modification that [the modification] would be permanent."  (SAC ¶ 16.)  Instead of

honoring that representation, claims Plaintiff, Aurora initiated foreclosure proceedings.  (Id.)

This claim also fails, because, "[t]o establish a negligent misrepresentation claim, the plaintiff must . . . prove that the defendant misrepresented an existing fact rather than a promise of future conduct."  Miller v. Raytheon Aircraft Co., 229 S.W.3d 358, 379–80 (Tex. App. 2007) (emphasis added).  "A promise to do or refrain from doing an act in the future is not actionable because it does not concern an existing fact."  BCY Water Supply Corp. v. Residential Invs., Inc., 170 S.W.3d 596, 603 (Tex. App. 2005).  Texas state and federal courts have repeatedly held that promises to modify a loan are precisely the kinds of forward-looking promises that cannot support a negligent misrepresentation claim.  See Thomas v. EMC Mortg. Corp., 499 F. App'x 337, 342 (5th Cir. 2012) (explaining that "representations regarding future loan modifications and foreclosure constitute promises of future action rather than representations of existing fact" and will not support a claim for negligent misrepresentation); De Franceschi v. BAC Home Loans Servicing, L.P., 477 F. App'x. 200, 205 (5th Cir. 2012) (holding, under Texas law, that promising not to foreclose on home while loan modification was pending was not an existing fact but a promise of future conduct); Ayers v. Aurora Loan Servs., LLC, 787 F. Supp.

2d 451, 456 (E.D. Tex. 2011) (same).  Accordingly, Plaintiff's second claim for negligent misrepresentation is dismissed.

    B.  <u>Fraud by Misrepresentation</u>

       To state a claim of fraud by misrepresentation under Texas law, a plaintiff must sufficiently allege (1) a misrepresentation that (2) the speaker knew to be false or made recklessly (3) with the intention to induce the plaintiff's reliance, followed by (4) actual and justifiable reliance (5) causing injury.  <u>Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.</u>, 620 F.3d 465, 468 (5th Cir. 2010) (quoting <u>Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.</u>, 51 S.W.3d 573, 577 (Tex. 2001)).

       Claims of fraud by misrepresentation must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b): "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  The Fifth Circuit strictly construes the Rule and requires the plaintiff "to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."  <u>Flaherty & Crumrine Preferred Income Fund, Inc., v. TXU Corp.</u>, 565 F.3d 200, 206–07 (5th Cir. 2009).

1.   <u>Alleged Intentional Omission of Information</u>

Plaintiff first alleges that Defendants "intentionally omitted information and misled Plaintiff so as to stop Plaintiff from taking actions to protect his interests."  (SAC ¶ 16.)  However, this vague allegation does not satisfy the heightened pleading requirements of Rule 9(b), because Plaintiff does not describe the "who, what, when, where, and how," as required for a fraud claim. <u>See</u> <u>Benchmark Elecs., Inc. v. J.M. Huber Corp.</u>, 343 F.3d 719, 724 (5th Cir. 2003).  "[A]rticulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."  <u>Williams v. WMX Techs.</u>, 112 F.3d 175, 177 (5th Cir. 1997). Plaintiff does not explain what information was "omitted," which communications that information was omitted from, who made the allegedly fraudulent statements and when, or how those misrepresentations prevented Plaintiff from "protect[ing] his interests."

Furthermore, "[a]lthough Rule 9(b) expressly allows scienter to be 'averred generally,' simple allegations that a defendant possesses fraudulent intent will not satisfy Rule 9(b)."  <u>Dorsey v. Portfolio Equities, Inc.</u>, 540 F.3d 333, 339 (5th Cir. 2009).  Instead, a plaintiff "must set forth <u>specific facts</u> supporting an inference of fraud," such as facts indicating the defendant's conscious behavior or

indicating that the defendant had a motive to commit fraud.  Id.  As the Fifth

Circuit has explained, the fact that Rule 9(b) permits scienter to be averred

generally "must not be mistaken for license to base claims of fraud on speculation

and conclusory allegations."  Tuchman, 14 F.3d at 1068 (internal quotations and

citation omitted).  Plaintiff, however, does not make any allegations supporting an

inference that Defendants possessed fraudulent intent when they made the alleged

misrepresentations.  Indeed, Plaintiff would have a difficult time making such an

allegation without explaining when the alleged misrepresentations were made or

who made them.

      Insofar as Plaintiff's fraud claim is based on his vague allegation that

Defendants "intentionally omitted information and misled Plaintiff so as to stop

Plaintiff from taking actions to protect his interests," therefore, it is subject to

dismissal for failure to meet the heightened pleading requirements of Rule 9(b).

      2.  Alleged Filing of Fraudulent Documents in the Real Property

         Records

      Plaintiff also alleges that Defendants "purposefully and intentionally

filed fraudulent documents in an attempt to take plaintiff's property when [they]

had no right to do so."  (SAC ¶ 18.)  "These documents," claims Plaintiff, "are

ones prepared and filed by Defendants in the real property records establishing a

chain of title in Defendants for the sole purpose of foreclosing on the property

when it [sic] had no right to do so."  (Id.)  Plaintiff alleges that "[t]he

representations were made with the intent that Plaintiff and others would rely upon

them and they are false."  (Id. ¶ 19.)  Plaintiff further alleges that he "did rely upon

these representations" when he "obtained representation for the purpose of

defending against the foreclosures."  (Id.)

These allegations are also insufficient to state a claim for fraud.  First,

Plaintiff's argument that Defendants filed "fraudulent" documents in the real

property records appears to be based on the same arguments—that the assignments

violated the bankruptcy court's order and the terms of the trust—that the Court has

already determined Plaintiff has no standing to challenge.

Even assuming that Plaintiff has standing to challenge the

assignments, however, Plaintiff's claim fails, because he has once again failed to

meet the heightened pleading requirements of Rule 9(b)—failed to provide the

"who, what, when, where, and how."  Benchmark Elecs., 343 F.3d at 724.  Plaintiff

concedes that the real property records do, on their face, "establish[] a chain of title

in Defendants," but he insists that those real property records are the result of the

"fraudulent documents" that Defendants "purposefully and intentionally filed."

(SAC ¶ 18.)  However, Plaintiff does not specify which of the Defendants—Aurora

Bank, Aurora Loan Services, Nationstar, or Deutsche Bank—filed the allegedly

fraudulent documents, which documents he believes are fraudulent and why, or

when those documents were filed.  Plaintiff's conclusory allegation that Defendants "purposefully and intentionally filed fraudulent documents in an attempt to take plaintiff's property" does not even meet Rule 12(b)(6)'s requirement that a plaintiff plead "enough facts to state a claim to relief that is plausible on its face," Twombly, 550 U.S. at 570, much less Rule 9(b)'s heightened particularity requirements.

Furthermore, even assuming that Plaintiff's allegations satisfied the heightened pleading requirements of Rule 9(b), Plaintiff has not stated a claim for fraud by misrepresentation because he fails to allege that he relied on Defendants' misrepresentations to his detriment.  Once again, Plaintiff argues that he suffered damages in reliance on Defendants' misrepresentations when he hired a lawyer, but his own allegations reveal that he hired a lawyer precisely because he did not believe or rely on Defendants' representations.  See Bennett, 2013 WL 655059, at *6 ("Plaintiff's statement that he retained legal counsel to 'prevent' the foreclosure fails to show reasonable reliance on his part, and shows instead his attempt to contest Defendants' purportedly fraudulent actions.").  In the absence of allegations of reliance, Plaintiff fails to state a claim for fraudulent misrepresentation.

C.  Negligence

Plaintiff alleges that "Defendant[s] owed Plaintiff a duty of ordinary care when instituting the foreclosure process and when filing documents in the Official Public records that [a]ffect Plaintiff['s] title."  (SAC ¶ 21.)  Plaintiff further alleges that "Defendants breached that duty and as a direct result Plaintiffs have been forced to obtain counsel and have suffered the damage of the costs of suit as well as suffered emotional stress."  (Id.)

"Under Texas law, the elements of a negligence claim are (1) a legal duty on the part of the defendant; (2) breach of that duty; and (3) damages proximately resulting from that breach."  Sport Supply Grp., Inc. v. Columbia Cas. Co., 335 F.3d 453, 466 (5th Cir. 2003).  "The threshold inquiry with regard to negligence is whether a legal duty existed."  Bank of America v. Babu, 340 S.W.3d 917, 928 (Tex. App. 2011) (citing Greater Houston Transp. Co. v. Phillips, 801 S.W.2d 523, 525 (Tex. 1990)).  The existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question.  Id.

Defendants insist that Plaintiff cannot state a negligence claim against them because Defendants do not owe Plaintiff a legal duty.  (Mot. at 6.)  "The contract between a lender and borrower," they argue, "does not give rise to any duty that would support a negligence claim."  (Id.)  To be sure, Plaintiff cites no authority for the proposition that "Defendant[s] owed Plaintiff[] a duty of ordinary

care when instituting the foreclosure process and when filing documents in the Official Public Records that [a]ffect Plaintiff['s] title" (SAC ¶ 21), and the Court is aware of none.  See 1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital, 192  S.W.3d 20, 36 (2005) ("Generally, the relationship between a borrower and a lender is an arm's length business relationship in which both parties are looking out for their own interests.").

Moreover, insofar as Plaintiff's negligence claims are based on the actions Defendants took while instituting the foreclosure process, those claims are barred by the economic loss doctrine, under which "a duty in tort does not lie when the only injury claimed is one for economic damages recoverable under a breach of contract claim."  Dewayne Rogers Logging, Inc. v. Propac Indus., LTD, 299 S.W.3d 374, 382–83 (Tex. App. 2009) (citing Sterling Chems., Inc. v. Texaco, Inc., 259 S.W.3d 793, 796 (Tex. App. 2007)).  Pursuant to the economic loss doctrine, where an action "depends entirely on pleading and proving the contract in order to establish a duty, the action remains one for breach of contract only, regardless of how it is framed by the pleadings."  OXY USA, Inc. v. Cook, 127 S.W.3d 16, 20 (Tex. App. 2003); see also Blanche v. First Nationwide Mortg. Corp, 74 S.W.3d 444, 453 (Tex. App. 2002) ("To be entitled to damages for negligence, a party must plead and prove something more than mere economic harm.").  But if the defendant's conduct "would give rise to liability independent of

the fact that a contract exists between the parties, the plaintiff's claim may . . .

sound in tort." Id. (emphasis added).  In this case, because the injury that Plaintiff

alleges arises solely out of the contractual relationship created by the Notes and

Deeds of Trust, his negligence claim is barred by the economic loss doctrine and

must be dismissed.  See Kiper v. BAC Home Loans Serv., LP, 884 F. Supp. 2d

561, 573 (S.D. Tex. 2012) (dismissing tort claims in mortgage that were "derive[d]

from the default and enforcement of the indebtedness at issue," explaining that the

plaintiff's "alleged tort damages are economic and arise from claims dependent

upon the existence of a contract"); Bassie v. Bank of Am., N.A., 4:12-CV-00891,

2012 WL 6530482, at *5 (S.D. Tex. Dec. 13, 2012) ("[T]he negligent conduct

alleged against Bank of America is necessarily based upon the Note and Deed.  In

other words, any harm that the plaintiffs allegedly suffered would be based on

Bank of America's purported failure to act pursuant to the terms of a 'contract,'

i.e., the Note and Deed."); Owens v. Bank of Am., NA, No. H–11–2552, 2012 WL

912721, at *4 (S.D. Tex. Mar. 16, 2012) (dismissing negligence claim because "the

sole potential basis for the defendant's liability is contractual in nature by the terms

of the Note and Deed of Trust").

III.   Quiet Title

       Plaintiff's second (but effectively fourth) cause of action is one to

quiet title.  (SAC ¶ 23.)  A suit to quiet title is an equitable action in which the

plaintiff seeks to remove from his title a cloud created by an allegedly invalid

claim.  Florey v. Estate of McConnell, 212 S.W.3d 439, 448 (Tex. App. 2006).

"Any deed, contract, judgment or other instrument not void on its face that

purports to convey any interest in or make any charge upon the land of a true

owner, the invalidity of which would require proof, is a cloud upon the legal title

of the owner."  Wright v. Matthews, 26 S.W.3d 575, 578 (Tex. App. 2000).

   Under Texas law, the elements of a cause of action to quiet title are:

(1) an interest in a specific property; (2) title to the property is affected by a claim

by the defendant; and (3) the claim, although facially valid, is invalid or

unenforceable.  Sadler v. Duvall, 815 S.W.2d 285, 293 n.2 (Tex. App. 1991).

Texas courts have made clear that "a necessary prerequisite to the . . . recovery of

title . . . is tender of whatever amount is owed on the note."  Fillion v. David

Silvers Co., 709 S.W.2d 240, 246 (Tex. App. 1986).  Furthermore, the plaintiff has

the burden of establishing his "superior equity and right to relief," relying on the

strength of his own title rather than the inferiority of the defendants' title.  See

Hahn v. Love, 321 S.W.3d 517, 531 (Tex. App. 2009).

   Plaintiff claims that he "ha[s] a valid Warranty Deed providing [him]

with superior legal title to the propert[ies]."  (SAC ¶ 23.)  Assuming that Plaintiff

does, in fact, own the two properties, Defendants' claim that they have the right to

foreclose on the properties pursuant to the assignment of the respective Deeds of

Trust constitutes a "cloud" upon Plaintiff's title.  <u>Routh v. Bank of Am.</u>, Cv. No.

5:12-CV-244-XR, 2013 WL 427393, at *4 (W.D. Tex. Feb. 4, 2013) (noting that

the "alleged right to foreclose constitutes a 'cloud' because it affects Plaintiffs'

legal title to the property").  Accordingly, Plaintiff has alleged facts sufficient to

support the first two elements of a quiet-title claim.

   However, Plaintiff fails to plead sufficient facts to support the third

element of an action to quiet title—namely, that "[Defendants'] claim, although

facially valid, is invalid or unenforceable."  <u>Sadler</u>, 815 S.W.2d at 293 n.2.  Again,

Plaintiff concedes that "the real property records establish[] a chain of title in

Defendants" (SAC ¶ 18), but he alleges that these records are invalid because

"Defendants have stepped in and filed assignments of Deeds of Trust based upon

invalid and/or fraudulent documents . . . ." (<u>id.</u> ¶ 23).  Apparently believing that his

obligation to repay his mortgage was extinguished when First Magnus went

through bankruptcy, Plaintiff asserts: "Plaintiff would show that the Deed of Trust

to its original creditor is the only valid lien and that the lien holder no longer

exists."  (Id. ¶ 23.)

   Once again, Plaintiff's argument that the Defendants' claim, though

facially valid, is unenforceable, is based on challenges to assignments that he has

no standing to bring.  Plaintiff concedes that the real property records appear to

grant Defendants the right to foreclose on the properties, but he claims that those

records must be fraudulent because Defendants "could not have properly obtained a valid assignment of the lien."  (SAC ¶ 5.)  In other words, Plaintiff's quiet-title claim is simply a repeated challenge to Defendants' right to foreclose based on allegedly fraudulent assignments.  Because Plaintiff does not have standing to challenge those assignments, he has no basis for arguing that Defendants' facially valid claim is unenforceable, and his quiet-title action fails.

IV.   Breach of Duty of Good Faith and Fair Dealing

Plaintiff next alleges that "Defendants owed Plaintiff a duty of good faith and fair dealing" and that "all of the above allegations" demonstrate that Defendants breached that duty.[3]   (SAC ¶¶ 24–25.)

A claim for breach of the duty of good faith and fair dealing is a tort action that arises from an underlying contract.  Cole v. Hall, 864 S.W.2d 563, 568 (Tex. App. 1993).  Texas law does not recognize an implied duty of good faith and fair dealing in every contract.  See English v. Fischer, 660 S.W.2d 521, 522 (Tex.

---

[3] Plaintiff asserts this cause of action on page 11 of the SAC and then asserts it again on the very next page, under the exact same subheading, and using almost identical language.  The Court notes that this—along with (1) the fact that the Complaint uses at least three different fonts (see ¶¶ 1, 3, 6); (2) incomplete sentences (see, e.g., SAC at 2 n.1; id. ¶ 16), (3) repeated references to "Plaintiffs" (see, e.g., id. ¶¶ 21, 22, 23)), and (4) an allegation that an unspecified "Defendant" entered into the "largest national consumer protection settlement in history" (see id. ¶ 6 (citing to a website detailing a settlement that did not involve any of the Defendants))—strongly suggests that Plaintiff's counsel "threw together" the SAC largely using paragraphs copied and pasted from other complaints.  Plaintiff's counsel is hereby put on notice that such practices are not acceptable in this Court.

1983).  Instead, "Texas courts have carved out exceptions for certain 'special relationships,' such as those between insurers and insureds, principal and agent, joint venturers, and partners."  Cole, 864 S.W.2d at 568.

"The relationship of mortgagor and mortgagee ordinarily does not involve a duty of good faith."  See Coleman, 795 S.W.2d at 70; accord White v. Mellon Mortg. Co., 995 S.W.2d 795, 800 (Tex. App. 1999) ("[T]he relationship between a mortgagor and a mortgagee does not give rise to a duty of good faith."); Thigpen v. Locke, 363 S.W.2d 247, 253 (Tex. 1962)) ("We know of no cases in this state which impose a duty of good faith and fair dealing on lenders in general to their borrowers: a debtor-creditor relationship does not give rise to such a duty."); Lovell v. Western Nat'l Life Ins., 754 S.W.2d 298, 303 (Tex. App. 1988) ("[T]here exists no special relationship between the [borrowers and note-holder] and, therefore, no duty of good faith and fair dealing is implied.").

At the hearing, Plaintiff's counsel insisted that Plaintiff had stated a claim for breach of the duty of good faith and fair dealing because the allegations in the SAC established the required "special relationship" between Aurora and Plaintiff.  For the first time, Plaintiff's counsel pointed to Gomes v. Bank of Am., N.A., Cv. No. 12-00311 DAE BMK, doc. # 14 (D. Haw. July 25, 2012), an unpublished order in which this Court found that the plaintiff had pleaded facts sufficient to establish a special relationship giving rise to a duty of care.  In that

case, the plaintiff had attempted numerous times to obtain a loan modification from

BAC, the mortgage servicer, and was repeatedly told that his mortgage needed to

be in default before it could be modified.  Id. at 3–4.  Accordingly, eight months

after he first began inquiring about a loan modification, Plaintiff decided to stop

paying his mortgage and submitted another application for a loan modification.  Id.

at 4.  Approximately one month later, Plaintiff received a Notice of Intent to

Accelerate his loan, so he contacted BAC again.  Id.  On January 20, 2010:

> a BAC employee named James explicitly told Plaintiff that he would be
> approved for a loan modification through HAMP [the Home Affordable
> Modification Program] once Plaintiff provided supporting documentation to
> corroborate the financial information he provided over the phone.  (Compl.
> ¶ 36.)  After Plaintiff's HAMP loan modification was denied due to
> insufficient information, a BAC servicing agent informed Plaintiff that his
> only recourse was to submit a new loan modification application.  (Id. ¶ 42.)
> When Plaintiff contacted BAC to reapply, a BAC employee again told
> Plaintiff that he was approved for a HAMP loan modification and that his
> loan modification would be processed once Plaintiff provided supporting
> financial documentation.  (Id. ¶ 43.)  Plaintiff immediately sent BAC
> updated financial information.  (Id.)  On or about September 28, 2010, a
> BAC employee named Doris reassured Plaintiff that his loan modification
> had been approved by the underwriters and that he should receive the loan
> modification agreement within the next thirty days.  (Id. ¶ 45.)  After
> approximately forty-five days, a BAC employee named Svetlana Martynova
> contacted Plaintiff to have him sign a certified copy of his financial
> statements, which Plaintiff immediately signed and faxed back.  (Id. ¶ 48.)
> A few days later, Martynova sent Plaintiff an email confirming that he
> would be receiving the HAMP modification agreement via FedEx within the
> next thirty to forty days.  (Id. ¶ 49.)  Even after Plaintiff received a letter
> indicating that he had been denied a HAMP loan modification, BAC
> continued to represent to Plaintiff that it was very likely that he would be
> approved for a loan modification.  (Id. ¶ 57.)  BAC also told Plaintiff's
> counsel that it was working on an in-house modification.  (Id. ¶ 54.)

Id. at 14–15.  The Court found that these allegations were sufficient "to support a finding that [BAC] went beyond its conventional role as a loan servicer by offering Plaintiff a loan modification and engaging with Plaintiff in the manner described above."  Id. at 15.  This "active participation," the Court explained, gave rise to "a duty of care in processing [the plaintiff's] loan modification application."  Id. at 16 (citing Crilley v. Bank of America, N.A., Civ. No. 12-00081 LEK-BMK, 2012 WL 1492413, at *10 (D. Haw. Apr. 12, 2012) (finding a duty based on similar allegations that the loan servicer engaged with plaintiffs for several months regarding loan modification)).  However, the Court was careful to clarify that

> [t]he allegations regarding Plaintiff's interactions with Defendant prior to January 20, 2010, [did] not demonstrate sufficient "active participation" . . . to trigger a duty of care.  With respect to Defendant's conduct prior to that date, Plaintiff merely allege[d] that Defendant failed to respond to each of Plaintiff's loan modification applications, told Plaintiff that his application was under review, and informed him that in order to qualify for a loan modification, he had to be delinquent on his mortgage payments.

Gomes, Cv. No. 12-00311 DAE BMK, doc. # 14, at 17 n.3.  In other words, the Court explained that a few scattered communications, even communications advising the plaintiff about how to qualify for a loan modification, would not necessarily establish a special relationship sufficient to give rise to a duty of care; a plaintiff must show that the mortgagee engaged in substantial, "active" participation that went beyond the traditional lender/borrower relationship. Compare Ansanelli v. JP Morgan Chase Bank, N.A., No. C 10-03892 WHA, 2011

WL 1134451, at *7 (N.D. Cal. Mar. 28, 2011) (finding a duty of care where the allegations showed that Defendant "went beyond its role as a silent lender and loan servicer to offer an opportunity to plaintiffs for loan modification and to engage with them concerning the trial period plan"), with Ottolini v. Bank of Am., Civ. No. 11-0477 EMC, 2011 WL 3652501, at *7 (N.D. Cal. Aug. 19, 2011) (finding no duty where "the application for loan modification had not progressed to a concrete stage and . . . there [was] no indication of the likelihood that such an application would have been granted").

Under the reasoning in Gomes, Plaintiff has not pleaded sufficient facts to give rise to the kind of special relationship that would support a claim for breach of the duty of good faith and fair dealing.  Even looking, as Plaintiff requests, to "all the above allegations" (for he does not point to specific occurrences in support of this claim), the only parts of the SAC that could be construed as supporting a finding of a "special relationship" between Aurora and Plaintiff are the following three sentences:

> Plaintiff did obtain a modification at one point from Aurora Mortgage but after representing that there would be a permanent modification if Plaintiff made the payments required by Aurora, it did not comply with the representation and decided after Plaintiff made substantial payment that they would not allow a modification in spite of their previous representation.

(SAC ¶ 8.)

> Defendant Aurora specifically told Plaintiff by and through a representative that he would be allowed to obtain a modification if he made certain

payments.  These representations were made by [an] Aurora representative to Plaintiff on or about January 2011 and Plaintiff relied upon those representations and paid money in reliance only to find out that Defendant Aurora took his money but failed to do as represented and provide the modification.

(Id. ¶ 11.)  These quotations both refer to the incident wherein Aurora allegedly informed Plaintiff that he could obtain a permanent loan modification and then did not give him one.

These allegations are not sufficient to give rise to the "special relationship" necessary to support a claim for breach of the duty of good faith and fair dealing.  Again, the undersigned stated in Gomes that the following allegations were not sufficient to transform the arm's-length mortgagee-mortgagor relationship into a "special relationship": that the defendant "failed to respond to each of Plaintiff's loan modification applications," that the defendant later "told Plaintiff that his application that his application was under review," and that the defendant then incorrectly "informed him that in order to qualify for a loan modification, he had to be delinquent on his mortgage payments."  Gomes, Cv. No. 12-00311 DAE BMK, doc. # 14, at 17 n.3.  These allegations, the Court stated, did not "demonstrate sufficient 'active participation' . . . to trigger a duty of care."  Id. It was not until that plaintiff began a months-long back-and-forth conversation with BAC employees, submitting financial documents and multiple applications at their request, that the mortgagee so exceeded its role as a "silent" lender as to

create a "special relationship."  Plaintiff's vague allegation that Aurora told him he

could obtain a permanent modification falls far short of such "active participation."

Even more tellingly, the Fifth Circuit recently rejected the contention

that the mortgagee had any "special relationship" with the mortgagor where the

plaintiff had alleged that he had had even more interactions with bank

representatives, including: (1) that he "applied for a loan modification through the

Home Affordable Modification Program ('HAMP')"; (2) that a bank employee

"orally represented that his home would not be foreclosed upon while his HAMP

application was pending, and that processing would likely take from 60 to 90

days"; (3) that, in response to a notice informing him that a non-judicial

foreclosure sale had been scheduled, he "called [the bank representative] to

confirm that foreclosure would not proceed until his HAMP application was

processed"; (4) that a bank representative "orally confirmed that the Property

would not be foreclosed upon while his application was pending"; (5) that, three

days later, he "received a handwritten notice from [the bank] informing him of the

foreclosure"; (6) that, "over the next few days, he contacted [the bank] on

numerous occasions and was given conflicting information," with some

representatives informing him that his HAMP application "remained pending" and

other that it had been denied"; and (7) that some bank representatives "told him

that the foreclosure sale had been stopped" while "others told him that the Property

had been sold and the sale was final." <u>Milton v. U.S. Bank Nat. Ass'n</u>, No. 4:10-CV-538, 2013 WL 264561, at *1 (5th Cir. Jan. 18, 2013).  Even in light of these numerous interactions between mortgagor and mortgagee, the Fifth Circuit concluded that the plaintiff's claims failed, explaining that "there is 'no special relationship between a mortgagor and mortgagee' that would give rise to a stand-alone duty of good faith and fair dealing." <u>Id.</u> (citing <u>UMLIC VP LLC v. T & M Sales & Envtl. Sys., Inc.</u>, 176 S.W.3d 595, 612 (Tex. App. 2005)).  In addition to demonstrating that the mere promise of a loan modification does not give rise to a special relationship, the Fifth Circuit's decision in <u>Milton</u>—which affirmatively states that "<u>there is no special relationship</u> between mortgagor and mortgagee," 2013 WL 264561, at *1 (internal quotation marks omitted; emphasis added)—casts doubt on the idea that even "active participation" by a mortgagee can give rise to the requisite special relationship under Texas law.

　　　　For the foregoing reasons, Plaintiff's allegation that an Aurora representative told him he could receive a permanent loan modification is insufficient to establish that Defendants owed him a duty of good faith and fair dealing.  Defendants cannot be held liable for violating a duty that they did not owe Plaintiff.  Accordingly, this claim is dismissed.

V.      Violations of the Texas and Federal Fair Debt Collection Acts

Plaintiff next alleges "that Defendants are all debt collectors and that they violated the state and federal fair debt collection acts."  (SAC ¶ 26.)  Plaintiff claims that "demanding the wrong amount, making claims that one is entitled to collection of a debt when they are not entitled and representing that if Plaintiff paid pursuant to a modification that Defendant would not attempt to foreclose only to take Plaintiff's money and not follow through are all violations of these acts." (Id. ¶ 27.)

A.  The Federal Fair Debt Collection Practices Act

The stated purpose of the Federal Fair Debt Collection Practices Act ("FDCPA") is to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692(e). It is intended to protect both debtors and non-debtors from misleading and abusive debt-collection practices.  See Wagstaff v. U.S. Dep't of Educ., 509 F.3d 661, 663 (5th Cir. 2007).

To be liable under the FDCPA, a defendant must qualify as a "debt collector," which the Act defines as "any person . . . who regularly collects or

attempts to collect . . . debts owed or due or asserted to be owed or due another."

15 U.S.C. § 1692a(6).  The term "debt collector" does not include:

> [A]ny person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . (ii) concerns a debt which was originated by such person [or] (iii) concerns a debt which was not in default at the time it was obtained by such person.

15 U.S.C. § 1692a(6)(G).  As the Fifth Circuit explained in Perry v. Stewart Title Co., "[t]he legislative history of section 1692a(6) indicates conclusively that a debt collector <u>does not include</u> the consumer's creditors, a mortgage servicing company, or an assignee of a debt, as long as the debt was not in default at the time it was assigned."  756 F.2d 1197, 1208 (5th Cir. 1985) (emphasis added) (citing S. Rep. No. 95–382, 95th Cong., 1st Sess. 3, reprinted in 1977 U.S.C.A.N. 1695, 1698)); <u>Bittinger v. Wells Fargo Bank NA</u>, 744 F. Supp. 2d 619, 626 (S.D. Tex. 2010) ("The activity of foreclosing on a property pursuant to a deed of trust is not the collection of debt within the meaning of the FDCPA.") (citing <u>Williams Countrywide Home Loans, Inc.</u>, 504 F. Supp. 2d 176, 190 (S.D. Tex. 2007)).

Defendants claim that they are not "debt collectors" as defined by the FDCPA and that Plaintiff's FDCPA claim therefore fails as a matter of law.  (Mot. at 12.)  However, some courts have read the Fifth Circuit's statement in <u>Perry</u> that "a debt collector does not include the consumer's creditors, a mortgage servicing company, or an assignee of a debt, as long as the debt was not in default at the time it was assigned," 756 F.2d at 1208, to mean that a mortgage servicing company <u>is</u>

considered a debt collector <u>if</u> the deed of trust was assigned to it after the plaintiff

defaulted.  See, e.g., <u>Reynolds v. Bank of Am., N.A.</u>, 3:12–CV–1420–L, 2013 WL

1904090, at *5 (N.D. Tex. May 8, 2013) (explaining that it was not possible to

determine from plaintiffs' allegations whether Bank of America was a debt

collector under the FDCPA because it was not clear whether Bank of America

began servicing plaintiffs' mortgage before they defaulted); <u>Miller v. BAC Home</u>

<u>Loans Servicing, LP</u>, Civ. No. 6:11CV22, 2012 WL 1206510, at *4 (E.D. Tex.

Mar. 23, 2012) (finding that BAC was not a debt collector under the FDCPA

because it "was the loan servicer when Plaintiffs defaulted on the loan"); <u>see also</u>

<u>Bridge v. Ocwen Fed. Bank</u>, 681 F.3d 355, 359 (holding that borrowers had

sufficiently pleaded an FDCPA claim because the defendant bank began servicing

their loan <u>after</u> they had defaulted).  In the present case, Plaintiff's allegations

indicate that Aurora was the mortgage servicer before Plaintiff defaulted; however,

Plaintiff's allegations indicate that Aurora assigned its interest in the Deeds of

Trust to Nationstar <u>after</u> Plaintiff's default, and Defendants' counsel appeared to

concede as much at the hearing.  Accordingly, while Aurora does not qualify as a

debt collector, Nationstar might.

    Regardless of whether Nationstar or any other Defendants qualify as

debt collectors, however, Plaintiff simply fails to state a claim under the FDCPA.

Plaintiff claims that Defendants violated the FDCPA when they (1) demanded the

wrong amount; (2) claimed that they were entitled to collect a debt when they were not entitled to; and (3) represented that they would not foreclose on the properties if Plaintiff paid pursuant to a modification.  (SAC ¶ 27.)   However, Plaintiff neither specifies which provisions of the Act Defendants' actions allegedly violated nor alleges that Defendants made any threats or otherwise threatened to take an action prohibited by law in connection with the foreclosure.  His vague allegation that Defendants "demand[ed] the wrong amount" is not sufficient to support the conclusion that Defendants committed a wrongful act, especially in the absence of any facts supporting that allegation (such as the amount allegedly demanded, the correct amount owed, the date of the alleged demand, or the method of the demand).  His allegation that Defendants claimed they were entitled to collect a debt when they were not entitled to simply repeats the same argument that the Court has already rejected: that Defendants were not authorized to foreclose because the assignments were fraudulent.  Finally, Plaintiff's allegation that Defendants violated the FDCPA when they represented that they would not foreclose if he paid pursuant to a loan modification fails for the same reason that could not support a claim for negligent misrepresentation: It does not allege a misrepresentation of existing fact.

In the absence of any facts that, taken as true, could support a claim under the FDCPA, Plaintiff cannot be said to have provided Defendants with fair notice of his FDCPA claim, and it must be dismissed.

B.  <u>The Texas Debt Collection Practices Act</u>

To state a claim under the Texas Debt Collection Practices Act ("TDCA"), Plaintiff must show: (1) the debt at issue is a consumer debt; (2) Defendants are debt collectors within the meaning of the TDCA; (3) Defendants committed a wrongful act in violation of the TDCA; (4) the wrongful act was committed against Plaintiff; and (5) Plaintiff was injured as result of Defendants' wrongful act.  <u>See</u> Tex. Fin. Code § 392.001 <u>et seq.</u>  The TDCA does not prevent a debt collector from "exercising or threatening to exercise a statutory or contractual right of seizure, repossession, or sale that does not require court proceedings." Tex. Fin. Code § 392.301(b)(3).

While Defendants may not qualify as debt collectors under the FDCPA, the TDCA "is much broader"; its definition of "debt collectors" is "intended to encompass creditors collecting their own debts."  <u>Marquez v. Fed. Nat'l Mortg. Ass'n</u>, Civ. A. No. 3:10–CV–02040–L, 2011 WL 3714623, at *4 (N.D. Tex. Aug. 23, 2011); <u>accord</u> <u>Fraley v. BAC Home Loans Servicing, LP</u>, No. 3:11–CV–1060–N–BK, 2012 WL 779130, at *5 (N.D. Tex. Jan. 10, 2012), <u>adopted by</u> 2012 WL 779654 (N.D. Tex. Mar. 9, 2012).  "Unlike the FDCPA, the

[TDCA] encompasses foreclosure activities by mortgage holders." <u>Akintunji v.</u>
<u>Chase Home Fin., L.L.C.</u>, Civ. A. No. H–11–389, 2011 WL 2470709, at *3 (S.D.
Tex. June 20, 2011).  Accordingly, Defendants qualify as debt collectors under the
TDCA.

           Nevertheless, Plaintiff fails to state a claim under the TDCA.  Again,
Plaintiff alleges that Defendants violated the TDCA by "demanding the wrong
amount, making claims that one is entitled to collection of a debt when they are not
entitled and representing that if Plaintiff paid pursuant to a modification that
Defendant would not attempt to foreclose . . . ."  (SAC ¶ 27.)  And again, Plaintiff
neither specifies which provisions of the Act Defendants' actions allegedly
violated nor alleges that Defendants made any threats or otherwise threatened to
take an action prohibited by law in connection with the foreclosure.  Accordingly,
Plaintiff's TDCPA claims fail for precisely the same reasons his FDCPA claims
fail.  <u>See</u> <u>Holley v. Bank of Am. Nat'l Ass'n</u>, 3:10-CV-2261-B, 2011 WL
1303252, at *2 (N.D. Tex. Apr. 4, 2011) (dismissing TDCA claims where
"Plaintiffs fail[ed] to specifically point Defendant or the Court to any threats,
prohibited actions, or false or deceptive statements attributable to Defendant that
violate the [TDCA]").

## VI.   <u>Unjust Enrichment</u>

Plaintiff claims that "Defendants are unjustly enriched by claiming to have rights to collect money from Plaintiff or the right to foreclose and hold a lien on Plaintiff's property when it [sic] has no right to do so." (SAC at 12.)  Plaintiff insists that "Defendants['] course of conduct and dealings with Plaintiff are unconscionable and the law of equities require[s] the Defendants not be unjustly enriched." (<u>Id.</u>)

"The unjust enrichment doctrine applies the principles of restitution to disputes which for one reason or another are not governed by a contract between the contending parties." <u>Burlington N. R.R. Co. v. Sw. Elec. Power Co.</u>, 925 S.W.2d 92, 97 (Tex. App. 1996), <u>aff'd sub nom.</u> <u>Sw. Elec. Power Co. v. Burlington N. R.R. Co.</u>, 966 S.W.2d 467 (Tex. 1998).  "When a defendant has been unjustly enriched by the receipt of benefits in a manner not governed by contract, the law implies a contractual obligation upon the defendant to restore the benefits to the plaintiff." <u>Id.</u> (citing <u>Barrett v. Ferrell</u>, 550 S.W.2d 138, 143 (Tex. Civ. App. 1977)).  Because a claim for unjust enrichment is "based on quasi-contract," it is "unavailable when a valid, express contract governing the subject matter of the dispute exists." <u>Coghlan v. Wellcraft Mar. Corp.</u>, 240 F.3d 449, 454 (5th Cir. 2001).

In this case, Plaintiff does not contest that the loan agreements constitute express contracts.  Furthermore, his claim for unjust enrichment, though very vague (see SAC at 12 ("Defendants are unjustly enriched by claiming to have rights to collect money from Plaintiff or the right to foreclose and hold a lien on Plaintiff's property when it [sic] has no right to do so.")), appears to arise out of the very same subject matter governed by the Notes and Deeds of Trust.

For the reasons already given, Plaintiff does not have standing to challenge the assignments that resulted in Nationstar acting as the mortgage servicer and in Deutsche Bank holding the Notes.  He has pleaded no facts to suggest that the loan agreements into which he entered when he obtained the mortgages on the properties were invalid.  Nor has he pleaded facts to support an inference that Defendants are attempting to collect anything more than what they are due pursuant to those loan documents.  Accordingly, because an unjust enrichment claim is "unavailable when a valid, express contract governing the subject matter of the dispute exists," Coghlan, 240 F.3d at 454, Plaintiff's unjust enrichment claim fails as a matter of law.  See Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 785 (Tex. 2000) ("The written contracts in this case foreclose any claims for unjust enrichment."); Montanez v. HSBC Mortg. Corp. (USA), 876 F. Supp. 2d 504, 516 (E.D. Pa. 2012) (dismissing unjust enrichment claim because "there [was] no dispute that the mortgage contract was valid and enforceable").

45

VII.   <u>Injunctive Relief</u>

For the reasons given, Plaintiff has failed to plead any viable causes of action.  Accordingly, his request for injunctive relief is denied.  <u>See</u> <u>Pajooh v. Harmon</u>, 82 F. App'x 898, 899 (5th Cir. 2003) (affirming district court's denial of injunctive relief where plaintiff had failed to state a claim).

VIII.  <u>Leave to Amend</u>

Plaintiff has already had three opportunities to state a claim for which relief may be granted.  (<u>See</u> docs. ## 1, 8, 17.)  He has not requested leave to amend the Second Amended Complaint—indeed, Plaintiff did not even file a Response to Defendants' Motion to Dismiss—and the Court will not <u>sua sponte</u> grant him leave to do so.

Following the Supreme Court's guidance, the Fifth Circuit uses five factors to determine whether to grant a party leave to amend a complaint: 1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment.  <u>Rosenzweig v. Azurix Corp.</u>, 332 F.3d 854, 864 (5th Cir. 2003) (citing <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)).

At least two of these factors—repeated failure to cure deficiencies by previous amendments and futility of amendment—weigh heavily against granting leave to amend in this case.  Plaintiff has already amended his Complaint twice,

46

and yet he still fails to state a claim.  Furthermore, for the reasons given, Plaintiff

lacks standing to challenge the assignment or securitization of the Deeds of Trust.

Allowing Plaintiff to amend his claims would be an exercise in futility.

Accordingly, the Court will not grant Plaintiff leave to amend the Complaint a

third time.  See DeLoach v. Woodley, 405 F.2d 496, 496–97 (5th Cir. 1968)

(noting that "[t]he liberal amendment rules of F.R. Civ. P. 15(a) do not require that

courts indulge in futile gestures").

CONCLUSION

For the reasons given, Defendants' Motion to Dismiss Plaintiff's

Second Amended Complaint (doc. # 19) is **GRANTED**.  Plaintiff's Second

Amended Complaint is **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**

**DATED:** San Antonio, Texas, June 25, 2013.

_____
David Alan Ezra
Senior United States District Judge